In the Interest of B.J.K. and J.R.K.

Juvenile Officer, Respondent,

v.

M.S. (Mother), Appellant,

J.P.K. (Father) and Any and All Potential Fathers to J.R.K., Defendants.

No. WD 66556.

Missouri Court of Appeals, Western District.

Aug. 1, 2006.

Chad A. Stewart, St. Joseph, MO, for Respondent.

Dawn M. Williams, St. Joseph, MO, for Appellant.

Before EDWIN H. SMITH, C.J., and SPINDEN and SMART, JJ.

EDWIN H. SMITH, Chief Judge.

M.S. (Mother) appeals from the judgment of the Circuit Court of Buchanan County, Juvenile Division, terminating her parental rights to her children, B.J.K. and J.R.K., pursuant to § 211.447.4(3).[1]

Mother raises one point on appeal. She claims that the juvenile court erred in terminating her parental rights to B.J.K. and J.R.K., pursuant to § 211.447.4(3), based on its findings that the children had "been under the jurisdiction of the Juvenile Court for a period in excess of one year"; that the "conditions, which led to the assumption of jurisdiction ... still persisted"; and, that there was "little likelihood that these conditions will be remedied at an early date so that the children could be placed in the care and custody of their mother or father in the near future"; "because the finding that the conditions which led to the assertion of juvenile court jurisdiction could not be remedied at an early date so that the children could be returned to the parent in the near future is not supported by substantial evidence."

We affirm.

## Facts

B.J.K., born on February 16, 2002, and J.R.K., born on March 14, 2003, are the natural children of Mother, who was born on May 23, 1978, and was twenty-seven years old at the time of trial. Mother has one other child, an older daughter who has always resided with Mother. J.P.K. is the natural father of B.J.K. The natural father of J.R.K. is unknown.

In April of 2003, Children's Services for the State of Missouri responded to a child abuse and neglect report. After investigating the report, the investigating agent, Cathy Coy, alleged that Mother, due to her admitted drug use at the time and throughout her pregnancy with J.R.K., did not provide adequate care for her children. Drug tests on April 18, 2003, and April 23, 2003, revealed positive results for cocaine, marijuana, and methamphetamine. The allegations of abuse and neglect were substantiated by the assigned Child Services caseworker, Cindy Gibson, resulting in the children being taken into custody by the Children's Division on April 23, 2003.

A Family Support Team (FST) meeting was conducted by the Children's Division on May 1, 2003. During the meeting, a social services plan to aid in the reunification of Mother with B.J.K. and J.R.K. was discussed. On the same day as the meeting, Mother entered an inpatient substance abuse treatment program at the Pioneer Program in St. Joseph, Missouri, which she successfully completed. The social services plan was signed by the Children's Division on June 2, 2003, and by Mother on June 8, 2003.

Pursuant to the social services plan entered into by Mother, she agreed to: (1) successfully complete an inpatient drug

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

treatment program; (2) submit to random urinalysis testing; (3) obtain and maintain stable housing; (4) seek employment; (5) attend drug counseling classes; (6) remain drug-free; (7) contact the Children's Division caseworker if she relapsed; (8) cooperate with all service providers; and (9) be calm and respectful when dealing with service providers. In an effort to assist Mother in meeting the terms of her social services plan, the Children's Division attempted to coordinate services, communicate with Mother regarding the children, arrange and facilitate FST meetings, notify Mother of any concerns regarding compliance with the terms of the social services plan, and support Mother in her efforts to remain drug- and alcohol-free.

Having completed the Pioneer Program drug treatment program and engaging in outpatient treatment, B.J.K. and J.R.K. were returned to Mother on September 30, 2003. Shortly afterwards, however, five hotline reports were received by the Children's Division concerning Mother, alleging drug use, leaving the children locked in a room, leaving the children unattended in a car, and Mother's using third-party urine to falsify required drug testing. Mother stopped participating in outpatient substance abuse treatment and was eventually arrested on December 20, 2003, for shoplifting. A conference was held by the Children's Division on December 29, 2003, at which time Mother admitted to continued drug use, including but not limited to IV drug use. As a result of Mother's continued substance problems, the children were voluntarily placed in the home of J.P.K., the biological father of B.J.K.

While the children were living with J.P.K., Mother continued to use illegal drugs, including methamphetamines, hydromorphone, marijuana, dilaudids, and OxyContin. On March 2, 2004, the Children's Division assisted Mother in gaining entrance into the Hannibal Council on Alcohol and Drug Abuse inpatient treatment facility, located in Hannibal, Missouri. However, Mother was unable to successfully complete the program and voluntarily left on March 10, 2004.

In March of 2004, Mother and J.P.K. began attending family counseling sessions at Catholic Charities in St. Joseph in an effort to reunify the family. Around that time, after a meeting with the Children's Division, Mother agreed to participate in an inpatient substance abuse treatment program at Preferred Family Healthcare in Trenton, Missouri, which she successfully completed in May of 2004.

While the children were in the care and custody of J.P.K., he tested positive for methamphetamines on June 7, 2004, violating the conditions of his probation. The record on appeal does not indicate the reason for his being on probation. As a result, the children were taken into protective custody by the Children's Division on June 8, 2004, and placed in foster care.

In July of 2004, Mother again began attending outpatient substance abuse treatment, but was unsuccessfully discharged in September of 2004 due to sporadic attendance and continued drug use. Mother also became involved with Narcotics Anonymous. The children were moved to a relative placement in July of 2004 and then to another foster home in January of 2005.

Several FST meetings were scheduled between June and August of 2004, which both Mother and J.P.K. failed to attend. On September 21, 2004, both parents did attend a scheduled FST meeting at which they admitted to using drugs. A urine test confirmed that Mother had been using methamphetamines, cocaine, opiates, amphetamines, and oxycodone.

A social services plan was entered into with Mother and J.P.K. on September 17, 2004, providing that both parents: (1) would attend and participate in drug treatment classes; (2) would attend and participate in family counseling; (3) would submit to random drug testing; (4) would provide all written reports regarding drug treatment to the Children's Division; (5) would maintain employment; (6) would not allow any other individuals to live with them; (7) would call the foster parents only once a week to speak with the children; and (8) would be truthful in all statements made to service providers. Mother failed to comply with this plan by failing to make herself available for urinalysis testing, failing to participate in substance abuse related treatment, failing to participate in family counseling, and by failing to obtain and maintain employment.

In October of 2004, Cindy Gibson attempted to arrange for further inpatient substance abuse treatment for Mother, which targeted her IV drug use, at the McCambridge Center in Columbia, Missouri. Mother participated in an initial intake process at which time she admitted to daily drug use and to shoplifting as a means of supporting her drug habit. Mother had two separate dates for admission at the center, but failed to show. On October 11, 2004, and again on October 18, 2004, Mother was arrested for shoplifting.

After Mother failed to enter the McCambridge Center and tested positive for opiates, marijuana, and methamphetamines, a juvenile court hearing was held on October 26, 2004, at which time the court suspended all visitation with the children by Mother and J.P.K. until they had complied with the terms of their social services agreement, including remaining drug-free.

Mother was again arrested for shoplifting on October 30, 2004, twice during November of 2004, and once in December of 2004. On December 12, 2004, Mother was again admitted to the Pioneer Program inpatient treatment program, but was discharged without completing the program when she left after only one hour at the facility.

Mother, as a result of being charged with shoplifting, was arrested on March 19, 2005. She was later convicted and on May 6, 2005, was sentenced to four years in the Missouri Department of Corrections. On the same day of her arrest, Mother submitted to a urine test and tested positive for methamphetamines, hydrocodone, opiates, cocaine, and marijuana.

On June 28, 2005, the Juvenile Officer of Buchanan County filed a petition for termination of Mother's parental rights to B.J.K. and J.R.K.; the parental rights of J.P.K. to B.J.K.; and the parental rights of any potential father of J.R.K. The petition alleged, in pertinent part:

Pursuant to Section 211.447.4(3) RSMo., the children have been under the jurisdiction of the juvenile Court for more than one year and conditions of a potentially harmful nature continue to exist and conditions which led to the assumption of jurisdiction still persist and there is little likelihood that those conditions will be remedied at an early date so that the children can be returned to the parents in the near future. Further, the continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home and:

a. [P]ursuant to Section 211.447.4(3)(a) RSMo., M.S. and J.K. have made little progress in complying with the terms of the social service plans entered into between them and the Children's Division.

b. [P]ursuant to Section 211.447.4(3)(b) RSMo., the efforts of the juvenile

officer, the Children's Division and other agencies to aid the parents on a continuing basis in adjusting M.S. and J.K.'s circumstances or conduct to provide a proper home for the children have failed.

c. [P]ursuant to Section 211.447.4(3)(d) RSMo., M.S. and J.K. have a chemical dependency which prevents M.S. and J.K. from consistently providing the necessary care, custody and control over the children and which cannot be treated so as to enable M.S. and J.K. to consistently provide such care, custody and control.

The petition was taken up and heard by the juvenile court on December 1, 2005.

At the termination hearing, Gibson testified, *inter alia*, that Mother's earliest release date from prison was September of 2006, and that in her opinion, it would be a minimum of six months to one year thereafter before reunification could occur. Joyce Estes, a counselor, who conducted approximately twenty therapy sessions with B.J.K., testified that B.J.K. has no emotional bond to Mother and did not have any specific memory of Mother. She testified that she also had seen J.R.K., but that she had not really worked with him. She further testified, that in her professional opinion, B.J.K. suffered from attachment disorder due to the inconsistent parenting of Mother and that it would be detrimental to the children to be reunified with Mother due to the amount of time that had elapsed since the last contact between her and the children.

Mother testified that she had attempted to provide support for the children while they were in foster care by providing some clothing, diapers, and Christmas gifts. She also testified that since her incarceration, she had remained clean and sober, and had participated in substance abuse classes and support groups to maintain her sobriety. She testified that she believed that a significant bond existed between the children and her, and the children and their older sister. She stated that to date, while incarcerated, she had completed self-help classes, vocational training, and a parenting class entitled "Patches," which aids in the reunification of children with their incarcerated parents. She testified that she believed that the existing bond between the children and her, and her efforts, while incarcerated, to conquer her drug problems and become a better parent would aid her in a successful reunification with her children.

On January 9, 2006, the juvenile court entered its findings of fact, conclusions of law, and judgment terminating Mother's parental rights to B.J.K. and J.R.K. and the parental rights of J.P.K. to J.R.K., pursuant to § 211.447.4(3). In terminating Mother and J.P.K.'s parental rights, the court found, in pertinent part, that the children had been under the jurisdiction of the court for a period in excess of one year, the conditions which led to the court's assumption of jurisdiction still persisted, there is little likelihood that these conditions will be remedied at an early date so that the children could be placed in the care and custody of their mother or father in the near future, and the continuation of the parent-child relationship greatly diminished the children's prospects for early integration into a stable and permanent home. The court also made the requisite findings as to the factors found in § 211.447.4(3)(a)-(d) in making its § 211.447.4(3) findings. Mother appeals, but J.P.K. does not.

## I.

In Mother's sole point on appeal, she claims that the juvenile court erred in terminating her parental rights to B.J.K. and J.R.K., pursuant to § 211.447.4(3),

based on its findings that the children had "been under the jurisdiction of the Juvenile Court for a period in excess of one year"; that the "conditions, which led to the assumption of jurisdiction ... still persisted"; and, that there was "little likelihood that these conditions will be remedied at an early date so that the children could be placed in the care and custody of their mother or father in the near future"; "because the finding that the conditions which led to the assertion of juvenile court jurisdiction could not be remedied at an early date so that the children could be returned to the parent in the near future is not supported by substantial evidence." Specifically, she claims that the juvenile court's finding, that "the conditions which led to the assertion of juvenile court jurisdiction could not be remedied at an early date so that the children could be returned to the parent in the near future," was not supported by substantial evidence in that "the court did not consider the likelihood that the objectives of a future service agreement could be achieved while the appellant is still incarcerated."

Termination of parental rights is governed by § 211.447.5, which provides, in pertinent part:

The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer or the division, or in adoption cases, by a prospective parent, if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 3 or 4 of this section.

Thus, to terminate parental rights under § 211.447.5, the juvenile court must find, *inter alia*, at least one of the statutory grounds set forth in § 211.447.2–4. § 211.447.5. If it does, to terminate, the

court must then find that the best interests of the child would be served by termination. Id. Thus, termination, pursuant to § 211.447.4(3) is a two-step procedure. *In the Interest of K.C.M.*, 85 S.W.3d 682, 689 (Mo.App.2002). In the first step, the court must determine whether termination is justified under one of the statutorily approved grounds for termination. *Id.* If the court finds that termination is justified under one of the statutorily approved grounds, it is then required, in the second step, to determine whether termination is in the best interests of the children. *Id.* Hence, "the court never reaches the issue of best interest, under § 211.447.5, unless and until a statutory ground for termination is proven." *Id.*

In *In the Interest of P.L.O.*, 131 S.W.3d 782, 788–89 (Mo. *banc* 2004) (citations omitted), the Missouri Supreme Court set forth the requisite standards of proof, as to the two-step termination procedure of § 211.447, and our standard of review of a judgment of termination:

The standard of review for judgments terminating parental rights is based on the requirements of section 211.447.5 that 1) the trial court must find by clear, cogent, and convincing evidence that one or more grounds for termination exists under subsections 2, 3 or 4 of section 211.447 and 2) the trial court must find that termination is in the best interests of the children. Whether statutory grounds under section 211.447.2, .3 or .4 have been proven by clear, cogent and convincing evidence is reviewed under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); in other words, the trial court's judgment will be affirmed unless no substantial evidence supports it, it is contrary to the weight of the evidence, or it erroneously declares or applies the law. Proof under this standard of only one of

the statutory grounds alleged is sufficient to sustain the judgment. Then after determining that one or more statutory grounds have been so proven, the court must consider the question of whether termination also is in the best interests of the child. On that question, the standard of proof at trial is a preponderance of the evidence, and the standard of review on appeal is abuse of discretion. In all of these determinations, the reviewing court is deferential to the fact-findings of the trial court and considers all the evidence and reasonable inferences from the evidence in the light most favorable to the judgment. "Clear, cogent and convincing evidence in an action for termination of parental rights is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In the Interest of L.E.C.*, 182 S.W.3d 680, 684 (Mo.App.2006) (citation omitted).

It is sufficient for termination of parental rights, under § 211.447.5, if one of the statutory grounds set forth in that section for termination is adequately pleaded and proved. *In the Interest of A.S.O.*, 75 S.W.3d 905, 912 (Mo.App.2002) (citation omitted). Hence, we must affirm a judgment terminating parental rights, pursuant to § 211.447, if the record supports termination on any one of the statutory grounds set forth in § 211.447.5. In this case, the juvenile court terminated Mother's parental rights based on the statutory ground found in § 211.447.4(3), "failure to rectify," one of the approved grounds for termination, which provides for termination if:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

To find the existence of the "failure-to-rectify" ground for termination, the juvenile court must find: (1) that the "child has been under the jurisdiction of the juvenile court for a period of one year"; (2) "*that* the conditions which led to assumption of jurisdiction still persist, *or* conditions of a potentially harmful nature continue to exist*"; and, (3) "*that* there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, *or* the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." § 211.447.4(3) (emphasis added); *see also In the Interest of A.R.*, 52 S.W.3d 625, 640–41 (Mo.App. 2001). Thus, as to the second and third required findings, there are two permissible alternative findings.

In interpreting § 211.447.4(3) as we do, as to the findings necessary to find the existence of the failure-to-rectify ground for termination, we are mindful of this court's decision in *In the Interest of K.D.H.*, 871 S.W.2d 651, 656 (Mo.App. 1994), which was not mentioned by this court in *A.R.*, which was decided after *K.D.H.* In *K.D.H.*, the court interpreted § 211.447.2(3), RSMo Supp.1993,[2] which is

---

**2.** Section 211.447 was amended in 1998 such that § 211.447.2(3) was renumbered as § 211.447.4(3).

identical to § 211.447.4(3), as requiring proof that:

> (1) The child must have been under the jurisdiction of the juvenile court for at least one year; and (2) either (a) the conditions which originally led the court to assume jurisdiction must still persist, or conditions of a potentially harmful nature continue to exist, and there is little likelihood that these conditions will be remedied at an early date so the child can be returned to the parent in the near future; or (b) the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

871 S.W.2d at 656. Unlike this court's interpretation of the statute in *A.R.*, the *K.D.H.* court read the statute as requiring only two findings, rather than three. Under its interpretation, the failure-to-rectify ground for termination could be found if the juvenile court found proof as to its denominated requirements (1) and (2)(a), *or* (1) and (2)(b). In doing so, the court read the phrase, which it denominated as (2)(a): "that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future," as being one finding, and that the phrase, which it denominated as (2)(b): "or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home," as an alternative finding to (2)(a). In so interpreting the statute, there is no citation to authority, other than the statute itself, and no discussion as to why the court believed that the statute should be so construed. This interpretation does not track the express language of the statute, rendering a result clearly not intended by the legislature.

■ In interpreting a statute, we are to ascertain the intent of the legislature and give effect to that intent, if possible, giving the language used its plain and ordinary meaning. *State v. Grubb*, 120 S.W.3d 737, 739 (Mo. banc 2003). "Where the legislative intent is made evident by giving the language employed in the statute its plain and ordinary meaning, we are without authority to read into the statute an intent, which is contrary thereto." *Pavlica v. Dir. of Revenue*, 71 S.W.3d 186, 189 (Mo.App.2002) (citation omitted). It is only when the legislative intent cannot be ascertained, by giving the language of the statute its plain and ordinary meaning, that the statute is considered ambiguous and the rules of statutory construction be applied. *State v. Lewis*, 188 S.W.3d 483, 487 (Mo.App.2006).

■ Giving the language of § 211.447.4(3) its plain and ordinary meaning, it is clear and unambiguous as to how it is to be read. It must be read as found by this court in *A.R.* There can be no argument that the first required finding to establish the "failure-to-rectify" ground is that the "child has been under the jurisdiction of the juvenile court for a period of one year." On that fact, both the *K.D.H.* and *A.R.* courts agree. This first phrase is followed by a comma and the words: "and the court finds," which is followed by "that," clearly indicating that a required finding follows. Following the first "that" is a second "that," clearly indicating that another required finding follows. Both "that" phrases contain an "or," signaling that within each required finding that there are two permissible, alternative findings. *See State v. Graham*, 149 S.W.3d 465, 467 (Mo.App.2004) (stating that "[t]he disjunctive 'or' in its ordinary sense marks

an alternative generally corresponding to the term 'either' "). However, rather than reading the second "that" as signaling that another required finding follows, the *K.D.H.* court, for reasons that are not readily apparent, inserted an "and," lumping the first "or" phrase of the second "that" phrase with the two alternative findings found in the first "that" phrase.

The *A.R.* court and our reading of § 211.447.4(3) is not only supported by the clear signposts placed in the statute by the legislature, the "that's," but by the logic found in the resulting scheme, which results from that interpretation. Clearly, the alternative findings, based on our interpretation of the statute, found in the first "that" phrase, are parallel as to their focus in that the juvenile court can satisfy this requirement by finding either: "*that* the conditions which led to the assumption of jurisdiction still persist, *or* conditions of a potentially harmful nature continue to exist." § 211.447.4(3) (emphasis added). These alternative findings are parallel in their focus in that both focus on the nature of the child's present and future conditions and circumstances with respect to continued parental care. This would indicate that the two "or" phrases of the first "that" phrase were intended to be alternatives as to the first required finding. Likewise, the alternative findings, based on our interpretation of the statute, found in the second "that" phrase, are parallel in their focus in that the juvenile court can satisfy this requirement by finding either: "*that* there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, *or* the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." § 211.447.4(3) (emphasis add-

ed). These alternative findings are parallel in their focus in that they both focus on the issue of whether the child's present and future conditions or circumstances, with respect to parental care, as found in the second required finding, doom the child's prospects for living in an acceptable environment with the parent. To split the two alternatives found in the second "that" phrase, as the *K.D.H.* court did, violates the obvious intent of the legislature to group these parallel, required alternative findings.

Further support for the *A.R.* court's and our agreed-upon interpretation of § 211.447.4(3) can be found in the fact that if the *K.D.H.* court's interpretation were accepted as being correct, parental rights could be terminated, pursuant to § 211.447.4(3), simply by showing that the child was under the jurisdiction of the juvenile court for a period in excess of a year and "the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." There would not have to be any showing either that the "conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist." This defies the fact that an essential part in determining whether to terminate parental rights is whether presently and in the future the child would be harmed by a continuing relationship with the parent. *In the Interest of K.A.W.*, 133 S.W.3d 1, 9 (Mo. *banc.* 2004). In any event, because we find that the interpretation given what is now § 211.447.4(3), by the *K.D.H.* court, was incorrect, we believe that *A.R.* overruled it, *sub silentio*, such that it and any of its progeny should not be followed in that respect.[3]

3. Our research only discloses one case: *In the*

*Interest of B.L.H.,* 158 S.W.3d 269, 277 (Mo.

■ Here, in terminating Mother's parental rights, pursuant to § 211.447.4(3), as we interpret it, the juvenile court found, *inter alia*, that the children had "been under the jurisdiction of the Juvenile Court for a period in excess of one year"; that the "conditions, which led to the assumption of jurisdiction [stating the conditions] still persisted"; that there was "little likelihood that these conditions will be remedied at an early date so that the children could be placed in the care and custody of their mother or father in the near future"; and, that "continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home." Thus, as to the second required finding for termination, under the "failure-to-rectify" ground, the juvenile court found the first alternative, and as to the third required finding, it found both alternatives.

In her Point Relied On, Mother does not challenge the juvenile court's findings as to the first two required findings for termination on the "failure-to-rectify" ground, that the children were under the jurisdiction of the juvenile court in excess of one year and that the conditions that led to assumption of jurisdiction still persisted. Likewise, as to the third required finding for termination on this ground, she does not challenge its alternative finding that "continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home." She only challenges its alternative finding, with respect to the third finding required, that there was "little likelihood that these conditions will be remedied at an early date so that the children could be placed in the care and custody of their mother or father in the near future." Inasmuch as either of

these alternative findings, as to the required third finding, in combination with the juvenile court's other findings, which are not challenged in Mother's Point Relied On, would be sufficient to satisfy the requirements for termination of parental rights on the "failure-to-rectify" ground, even if we were to find that Mother is correct in her sole point on appeal, asserting that the record does not support the one alternative finding that was challenged, her appeal necessarily must fail. This is so in that the "existence of even one statutory ground for termination is sufficient if termination is in the children's best interests." *In the Interest of T.F.S.*, 52 S.W.3d 44, 48 (Mo.App.2001). Here, Mother does not challenge on appeal the findings of the juvenile court, which are sufficient for terminating her parental rights, pursuant to § 211.447.4(3), requiring us to affirm without reviewing the moot challenge that she does raise as to the court's findings.

■■ In the argument portion of her sole point on appeal, Mother does make a very limited argument that the record does not support the juvenile court's finding, as to the second required finding for termination pursuant to § 211.447.4(3), that the conditions under which the court assumed jurisdiction still persisted. However, Rule 84.04(e) limits argument to only those issues raised in the Point Relied On such that we are to address those issues alone. *Helmig v. State*, 42 S.W.3d 658, 666 (Mo.App.2001). Hence, we do not address the issue of whether the record supports the juvenile court's finding that the conditions under which the court assumed jurisdiction of Mother's children persisted. In any event, even if we were to address that issue, *ex gratia*, Mother's claim is without merit. Her only argument in support of

App.2005).

such a claim is that there is contrary evidence in the record that would have supported the juvenile court's finding that the conditions under which the court assumed jurisdiction over the children did not persist. This argument misunderstands our standard of review. In our review, we are to view the evidence in a light most favorable to the juvenile court's decision and ignore any evidence to the contrary. *P.L.O.*, 131 S.W.3d at 788–89.

Point denied.

## Conclusion

The judgment of the juvenile court, terminating Mother's parental rights to her children, B.J.K. and J.R.K., pursuant to § 211.447.4(3), is affirmed.

SPINDEN and SMART, JJ., concur.